# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CAMOFI MASTER LDC,

               Plaintiff,

    - against -

GLOBAL AXCESS CORPORATION

               Defendant.

No. 07 Civ. 9317 (HB)

**DECLARATION OF
FREDERICK W. PRESTON, JR.,
IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT**

---

Frederick W. Preston, Jr., states the following:

1.     I am a Senior Vice President of Wachovia Bank, N.A. ("Wachovia"), and I am authorized to execute this Declaration on behalf of Wachovia. My office address is 225 Water Street, Jacksonville, FL 32231. I have been employed by Wachovia since 1991. I am the Wachovia officer assigned to oversee and manage Wachovia's banking relationship with Global Axcess Corporation and certain of its affiliates ("Global").

2.     On or about October 27, 2005, CAMOFI Master LDC ("CAMOFI"), Global, and Wachovia entered into a Subordination Agreement, a copy of which is attached as Exhibit A (the "Subordination Agreement"), pursuant to which CAMOFI agreed to subordinate all indebtedness owed by Global to CAMOFI, including the indebtedness evidenced by that certain $3,500,000 senior subordinated secured convertible promissory note from Global, as maker, in favor of CAMOFI, as payee, a copy of which is attached as Exhibit B (the "CAMOFI Note"), to all obligations of Global to Wachovia.

3.    In reliance on the Subordination Agreement, Wachovia extended or renewed certain secured credit to Global. Based on the Subordination Agreement, payment of the CAMOFI Note is subordinated to the prior payment of the Wachovia loans.

4.    The CAMOFI Note granted CAMOFI a security interest in Global's assets (see Exh. B, Note § 9(d)). Because Wachovia already held a security interest in Global's assets at the time of CAMOFI's loan to Global, CAMOFI's security interest in such assets is junior to Wachovia's security interest in such assets. Pursuant to the Subordination Agreement, CAMOFI agreed that it would not at any time contest the validity, perfection, priority or seniority of Wachovia's security interest (see Exh. A, Subordination Agreement § 10).

5.    In addition, Section 5 of the Subordination Agreement, captioned "Remedy Standstill," restricts CAMOFI's ability to "exercise any Remedy," including the filing of a lawsuit, against Global under the "Junior Debt" (as defined in the Subordination Agreement), including the CAMOFI Note.[1]

6.    Section 5 of the Subordination ("Remedy Standstill") provides that CAMOFI may not exercise any Remedy (as defined in the Subordination Agreement), including accelerating the CAMOFI Note or filing suit against Global to enforce the CAMOFI Note or other Junior Debt, "until the earliest" of one of five conditions precedent has occurred:

> "(i) the date the Senior Debt [i.e., the debt that Global owes to Wachovia, see Subord. Agr. § 1] has been paid in full;
>
> "(ii)  the date a Proceeding [i.e., a bankruptcy filing or similar action by Global, see Subord. Agr. § 1] is commenced;
>
> "(iii) the date the Senior Debt has been accelerated in writing;

---

[1] "Remedy" is defined in section 1 of the Subordination Agreement as including "the right to sue" Global.

"(iv) at least one hundred and eighty (180) days shall have elapsed after [Wachovia]'s receipt of a written notice from [CAMOFI] stating that [CAMOFI] intends to commence an action against [Global] or any Co-Borrower by reason of a Default; or

"(v) such time as [Wachovia] consents in writing to the termination of the Standstill Period (the "Standstill Period")."

(See Exh. A, Subord. Agr. § 5).

7.     The *first* condition precedent provides that CAMOFI may not institute suit or exercise any other Remedy against Global until "the date the Senior Debt has been paid in full." The Senior Debt includes all obligations owed by Global or any co-borrower to Wachovia, including without limitation any related charges such as interest, fees, costs and expenses. The Senior Debt had not been paid in full at the time CAMOFI filed this action, nor has it been paid in full as of the date of this Declaration.

8.     Under the *second* condition precedent, CAMOFI may not institute suit or exercise any other Remedy against Global until "the date a Proceeding is commenced." The Subordination Agreement defines the term "Proceeding" to include, among other things, a bankruptcy filing or similar event with respect to Global. Wachovia has not received notice of any Proceeding commenced by Global and to the best of Wachovia's knowledge, no "Proceeding" has been commenced as of the date of this Declaration.

9.     Under the *third* condition precedent, CAMOFI may not institute suit or exercise any other Remedy against Global until "the date the Senior Debt has been accelerated in writing." To date, Wachovia has not accelerated the Senior Debt in writing.

10.     Under the *fourth* condition precedent, CAMOFI may not institute suit or exercise any other Remedy against Global until at least 180 days after CAMOFI gives Wachovia written notice of its intent to commence an action as a result of a Default. (See Exh. C, Subord. Agr. § 5). "Default" is defined as "default or an event of default under the [CAMOFI Note] or

under any other instrument or agreement evidencing the Junior Debt." (See id. § 1). The notice provision in section 16 and Annex I of the Subordination Agreement requires notices to Wachovia to be sent to John Whitner at Wachovia's office at 225 Water Street, Jacksonville, FL 32231. To the best of my knowledge, Wachovia has never received notice from CAMOFI of its intention to commence an action against Global.

11.    Under the *fifth* condition precedent, CAMOFI may not institute suit or exercise any other Remedy against Global until "such time as [Wachovia] consents in writing to the termination of the Standstill Period". Wachovia has never granted such consent.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct. Executed on June 23, 2008.

FREDERICK W. PRESTON, JR., Senior Vice President

# EXHIBIT A

## SUBORDINATION AGREEMENT

THIS SUBORDINATION AGREEMENT (this "Agreement") is made as of October __, 2005, by and among WACHOVIA BANK, NATIONAL ASSOCIATION, a national banking association (the "Senior Lender"), the lenders listed on Schedule A attached hereto (each a "Junior Lender", and collectively, the "Junior Lenders"), and GLOBAL AXCESS CORP, a Nevada corporation (the "Borrower").

## RECITALS

A.  The Senior Lender has made certain credit available to the Borrower and certain of its affiliates and intends to make certain additional credit available to the Borrower and its affiliates pursuant to the terms and provisions of the Third Amended and Restated Loan Agreement, dated as of October 27, 2005 (as amended, modified or amended and restated from time to time, the "Loan Agreement"), by and among the Senior Lender, the Borrower, Nationwide Money Services, Inc. ("Nationwide"), EFT Integration, Inc., and Axcess Technology Corporation ("Axcess", and together with Nationwide, EFT, and Electronic; collectively the "Co-Borrowers");

B.  The Junior Lenders intend to make certain credit available to the Borrower pursuant to the terms and provisions of certain 9% Senior Subordinated Secured Convertible Notes, dated as of October 27, 2005, by and between the Junior Lenders and the Borrower, each in the principal amount set forth opposite the Junior Lender's name on Schedule A, and in connection therewith the Co-Borrowers will be required to guarantee the payment and performance of certain obligations of the Borrower pursuant to the Junior Notes (as defined below), the Securities Purchase Agreement (as defined below) and certain other obligations pursuant to a Subsidiary Guarantee dated October 27, 2005 (the "Junior Guaranty"); and

C.  It is a condition to the Senior Lender's obligations to furnish credit to the Borrower that the Junior Lenders enter into this Agreement;

NOW, THEREFORE, in consideration of the above recitals and the provisions set forth herein, and other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows, intending to be legally bound:

## AGREEMENT

Section 1.     **Definitions.  For purpose of this Agreement, the following terms used herein shall have the following meanings:**

"Collateral" means any and all property which now constitutes or hereafter will constitute collateral or other security for payment of the Senior Debt pursuant to the Senior Loan Documents.

"Default" means a default or event of default under the Junior Notes, or any of them, or under any other instrument or agreement evidencing the Junior Debt.

JACK_508858.2

"Junior Debt" means all indebtedness, obligations, and liabilities of the Borrower or any Co-Borrower or guarantor to the Junior Lenders, whether under the Junior Note, the Securities Purchase Agreement, the Junior Guaranty, the Junior Security Agreement, any other Security Document (as defined in the Securities Purchase Agreement), the Registration Rights Agreement (as defined in Securities Purchase Agreement), or otherwise, including, without limitation, all principal and interest (including, without limitation, any interest accruing after the filing of any petition in bankruptcy or the commencement of any Proceeding, whether or not a claim for post-filing or post-petition interest is allowed in such Proceeding) and late fees payable thereunder, and any obligation to redeem, repurchase or otherwise acquire any Junior Securities.

"Junior Guaranty" has the meaning ascribed thereto in the Recitals.

"Junior Notes" means those certain 9% Senior Subordinated Secured Convertible Notes, dated as of October 27, 2005, of the Borrowers in favor of the Junior Lenders, dated the date hereof, in the aggregate original principal amount of $3,500,000 and all note(s) issued in substitution therefore.

"Junior Securities" means any securities (including common stock, warrants or other equity securities), issued pursuant to the Securities Purchase Agreement or upon conversion of the Junior Notes or in exchange for any of the Junior Debt.

"Junior Security Agreement" means the Security Agreement dated October 27, 2005, by the Borrower and Co-Borrowers in favor of the Junior Lenders granting the Junior Lenders a security interest in certain collateral to secure the payment and performance of the Junior Debt.

"Person" means any corporation, association, joint venture, partnership, limited liability company, organization, business, individual, trust, government or agency or political subdivision thereof, or any other legal entity.

"Proceeding" means (a) any insolvency, bankruptcy, receivership, custodianship, liquidation, reorganization, readjustment, composition, or other similar proceeding relating to Borrower or any Co-Borrower or any of their respective properties, whether under any bankruptcy, reorganization, or insolvency laws or any law relating to relief of debtors, readjustment of indebtedness, reorganization, composition, or extension; (b) any proceeding for the liquidation, liquidating distribution, dissolution, or other winding up of Borrower or any Co-Borrower, voluntary or involuntary, whether or not involving insolvency or bankruptcy proceedings; (c) any assignment for the benefit of creditors of Borrower or any Co-Borrower; or (d) any other marshalling of the assets of Borrower or any Co-Borrower.

"Remedy" means, with respect to a Default, the acceleration of any Junior Note or the exercise of any remedies in respect of such Default (including, without limitation, the right to sue the Borrower or any Co-Borrower, to exercise any right of set off, to put or otherwise tender for repurchase any Junior Notes or Junior Securities, and to file or participate in any involuntary bankruptcy proceeding against the Borrower or any Co-Borrower, and explicitly including the imposition of default rate interest).

"Securities Purchase Agreement" means that certain Securities Purchase Agreement, dated as of the date hereof, among the Junior Lenders and the Borrower.

"Senior Debt" means all of the following:  (a) the aggregate principal indebtedness outstanding from time to time under the Loan Agreement, (b) all interest accrued and accruing on such aggregate principal amounts from time to time (including, without limitation, any interest accruing after the filing of any petition in bankruptcy or the commencement of any Proceeding, whether or not a claim for post-filing or post-petition interest is allowed in such Proceeding), (c) all other costs, fees, and expenses owed from time to time under the Senior Loan Documents and (d) all other liabilities, indebtedness and obligations of Borrower or any Co-Borrower to the Senior Lender, whether now existing or hereafter arising, direct or indirect, contingent or non-contingent, secured or unsecured, due or not due.

"Senior Event of Default" means the occurrence and continuance of an "Event of Default" under the Senior Loan Documents.

"Senior Loan Documents" means the Loan Agreement, the Senior Note, and the other Loan Documents (as defined in the Loan Agreement), as they may be amended, modified, extended, or amended and restated from time to time.

"Senior Note" means the Note (as defined in the Loan Agreement) and any other promissory note executed and delivered by the Borrower or any Co-Borrower to the Senior Lender from time to time, as amended, modified, renewed or extended from time to time.

### Section 2.    General.

The Borrower and each Co-Borrower and the Junior Lender agree that on the terms and conditions herein the payment of the Junior Debt by the Borrower or any Co-Borrower is subordinated, to the extent and in the manner provided in this Agreement, to the prior payment in full of all the Senior Debt; provided, however, the failure of the Borrower or any Co-Borrower to make a payment of any of the Junior Debt by reason of any provision of this Agreement shall not be construed as preventing the occurrence of a Default with respect to the Junior Debt. Notwithstanding the foregoing, except as provided in Section 3, the Borrower may pay, and the Junior Lender may retain, all scheduled interest payments under the Note at non-default interest rates.  Nothing herein shall be deemed to prohibit the accrual of default interest (to the extent it exceeds the non-default interest rate), late fees or other liquidated damage amounts, provided that such amounts shall only be paid with the consent of the Senior Lender or upon the payment in full of all of the Senior Debt.

### Section 3.    Subordination in the Event of Certain Senior Debt Defaults.

If a Senior Event of Default occurs and is continuing or a Blockage Period (as defined below) exists (a "Senior Payment Blockage Period"), then during the period (such period, the "Blockage Period") (x) commencing on the date that the Senior Lender gives a written notice to the Borrower, the Co-Borrowers and the Junior Lender identifying the Senior Event of Default or stating that a Senior Payment Blockage Period is in effect and stating that a Blockage Period will commence (the "Blockage Notice") and (y) ending on the earliest to occur of:

( )    the date, if any, on which the Senior Debt is indefeasibly paid in full;

( )    the date on which the Borrower, the Co-Borrowers and the Junior Lender receive from the Senior Lender a written notice that (A) the Blockage Period has been terminated; or (B) that the Senior Event of Default is cured or waived in accordance with the Senior Loan Documents; and

( )    the date that is 180 days after the Blockage Notice was given,

no payment shall be made by or on behalf of the Borrower or any Co-Borrowers on account of the Junior Debt.  Upon the expiration of a Blockage Period, the Borrower or any Co-Borrower may make, and the Junior Lender shall be entitled to retain, all payments to the Junior Lender that were prohibited during the Blockage Period; provided that such payments shall include interest payments at the non-default rate.  Any interest accruing at a rate in excess of the non-default rate after the expiration of a Blockage Period shall be paid only with the prior written consent of the Senior Lender, in its sole discretion.  No Senior Event of Default that formed the basis for a Blockage Period shall serve as the basis for the commencement of any subsequent Blockage Period unless such Senior Event of Default is cured or waived for a period of 90 consecutive days.

**Section 4.    <u>Subordination in the Event of a Proceeding.</u>**

Upon any distribution of assets of the Borrower or any Co-Borrower upon any Proceeding:

( )    the Senior Lender shall first be entitled to receive payments in full of the Senior Debt in cash, property or securities (with any such property or securities being valued based on its fair market value after deducting liquidation and sale expenses) before the Junior Lender is entitled to receive any payment (other than Junior Securities) on account of the Junior Debt;

( )    any payment or distribution of assets of the Borrower or any Co-Borrower of any kind or character, whether in cash, property, or securities (other than Junior Securities) to which the Junior Lender would be entitled except for the provisions of this Agreement, shall be paid by the liquidating trustee or agent or other Person making such a payment or distribution, directly to the Senior Lender, to the extent necessary to pay the Senior Debt in full in cash, property or securities (valued as provided in subsection (i) above) after giving effect to all concurrent payments and distributions; and

( )    in the event that, notwithstanding the foregoing, any payment or distribution of assets of the Borrower or any Co-Borrower of any kind or character, whether in cash, property, or securities (other than Junior Securities), shall be received by the Junior Lender on account of the Junior Debt before the Senior Debt is paid in full in cash, property or securities (valued as provided in subsection (i) above), such payment or distribution shall be received and held in trust by the Junior Lender for the benefit of the Senior Lender, to the extent necessary to pay the Senior Debt in full in cash, property or securities (valued as provided in subsection (i) above) after giving effect to all concurrent payments and distributions.

The Borrower or any Co-Borrower shall give written notice to the Senior Lender and the Junior Lender within three days of receipt of notice of any Proceeding.

Section 5.    **Remedy Standstill.**

The Junior Lender shall not exercise any Remedy in respect of any Default until the earliest of (i) the date the Senior Debt has been paid in full, (ii) the date a Proceeding is commenced, (iii) the date the Senior Debt has been accelerated in writing, (iv) at least one hundred and eighty (180) days shall have elapsed after Senior Lender's receipt of a written notice from the Junior Lender stating that the Junior Lender intends to commence an action against the Borrower or any Co-Borrower by reason of a Default, or (v) such time as Senior Lender consents in writing to the termination of the Standstill Period (the "Standstill Period"). Upon the termination of any Standstill Period, then the Junior Lender may, at its sole election, exercise any and all Remedies available to it under applicable law.

Section 6.    **Payments Held in Trust, Subrogation, Right to Cure and Purchase.**

( )    If any payment or distribution of assets on account of the Junior Debt shall be made by the Borrower or any Co-Borrower or received by the Junior Lender (x) at a time when such payment or distribution was prohibited by the provisions of this Agreement or (y) in connection with any indemnity claim under the Securities Purchase Agreement (including Section 4.11 of the Securities Purchase Agreement) (any payment received in connection with such indemnity claim, an "Indemnity Payment"), then such payment or distribution shall be received and held in trust by the Junior Lender for the benefit of the Senior Lender and shall be paid or delivered by the Junior Lender to the Senior Lender to the extent necessary to enable payment in full of the Senior Debt.

( )    After the payment in full of all Senior Debt, the Junior Lender shall be subrogated to the rights of the holders of such Senior Debt to receive payments or distributions of assets of the Borrower or any Co-Borrower applicable to the Senior Debt until all amounts owing on the Junior Debt plus the Indemnity Payment (plus interest as set forth above) shall be paid in full, and for the purpose of such subrogation no such payments or distributions to the holders of the Senior Debt by or on behalf of the Borrower or any Co-Borrower, or by or on behalf of the Junior Lender by virtue of this Agreement, that otherwise would have been made to the Junior Lender shall, as between the Borrower and the Junior Lender, be deemed to be payment by the Borrower to or on account of the Senior Debt in respect thereof, it being understood that the provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the Junior Lender, on the one hand, and the holders of such Senior Debt, on the other hand.  If any payment or distribution to which the Junior Lender would otherwise have been entitled but for the provisions of this Agreement shall have been applied, pursuant to the provisions of this Agreement, to the payment of amounts payable under the Senior Debt, then the Junior Lender shall be entitled to receive from the holders of the Senior Debt any payments or distributions received by such holders of the Senior Debt in excess of the amount sufficient to pay all amounts payable under or in respect of such Senior Debt in full.

( )    The Senior Lender hereby grants the Junior Lender the right, but not the obligation, to cure any and all defaults under the Senior Debt (to the extent any such defaults are curable) within the same period of time afforded the Borrower or any Co-Borrower for curing such defaults before the same become Senior Events of Default. The Senior Lender shall have no obligation hereunder, however, to provide notice of any Senior Event of Default to the Junior Lender, and the lack of any such notice shall not affect the existence or occurrence of any Event of Default.

**Section 7.**      **No Prejudice or Impairment.**

Nothing contained in this Agreement, is intended to or shall impair, as between the Borrower or any Co-Borrowers and the Junior Lender, the obligation of the Borrower or any Co-Borrowers, which is absolute and unconditional, to pay to the Junior Lender the Junior Debt as and when the same shall become due and payable in accordance with its terms, or is intended to or shall affect the relative rights of the Junior Lender and creditors of the Borrower or any Co-Borrowers (other than the holders of the Senior Debt).

**Section 8.**      **Proofs of Claim.**

In connection with any Proceeding involving any Borrower, the Junior Lender is entitled to file proofs of claim in respect of the Junior Debt. Upon the failure of the Junior Lender to take any such action as of the fifteenth Business Day preceding the bar date for the filing of proofs of claims, the Senior Lender is hereby irrevocably authorized and empowered, but shall have no obligation to file proofs of claim with respect to the Junior Debt. Notwithstanding the foregoing, the Senior Lender shall not have any right whatsoever to vote any claim that the Junior Lender may have in the Proceeding to accept or reject any plan or partial or complete liquidation, reorganization, arrangement, composition, or extension; provided, that the Junior Lender shall not vote with respect to any such plan or take any other action in any way so as to contest (i) the relative rights and duties of the Senior Lender under the Senior Loan Documents with respect to any collateral or guaranties or (ii) the Junior Lender's obligations and agreements set forth in this Agreement.

**Section 9.**      **Benefit of Agreement; Amendments of Certain Documents; etc.**

This Agreement shall constitute a continuing offer to all Persons who, in reliance upon such provisions, become a Senior Lender, and such provisions are made for the benefit of each subsequent Senior Lender and each of them may enforce such provisions.

The Senior Loan Documents may be amended, supplemented, waived, altered, modified, or otherwise changed in any manner approved by the Senior Lender and the Borrower or any Co-Borrower without the consent or approval of the Junior Lender. The Junior Loan Documents may be amended, supplemented, waived, altered, modified, or otherwise changed in any manner approved by the Junior Lender and the Borrower or any Co-Borrower, except that the Junior Lender shall not, without the prior written approval of the Senior Lender, amend the Junior Loan Documents if the effect of such amendment is to (1) increase the interest rate other than as a result of the application of a default rate of interest; (2) provide for any loan or similar fees to be paid by the Borrower or any Co-Borrower; (3) accelerate the amortization or maturity date of

any payments of principal or any other amounts; (4) change any other repayment provisions or provide for any collateral, guaranty, or pledge (other than as required by the Junior Loan Documents as in effect on the Closing Date); or (5) add or modify any covenant in the Junior Loan Documents in a manner so as to make it more restrictive on the Borrower or any Co-Borrower.

The Senior Lender shall have no obligation to preserve rights in the Collateral against any prior parties or to marshal any of the Collateral for the benefit of any Person. No failure to exercise, and no delay in exercising on the part of any party hereto, any right, power, or privilege under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power, or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power, or privilege. The rights and remedies provided in this Agreement are cumulative and shall not be exclusive of any rights or remedies provided by law.

Except as expressly set forth herein, there shall be no third party beneficiaries of this Agreement.

### Section 10.    <u>Further Agreements Concerning the Collateral and Senior Debt.</u>

Each Junior Lender agrees that (i) it will not at any time contest the validity, perfection, priority or enforceability of the security interests and liens granted by the Borrower or any Co-Borrower to the Senior Lender in the Borrower's assets; (ii) the Senior Lender may administer the Senior Debt and any of the Senior Lender's agreements with the Borrower or any Co-Borrower in any way the Senior Lender deems appropriate consistent with the terms and provisions of the Senior Loan Documents, without regard to the Junior Lenders or the Junior Debt; (iii) the Senior Lender shall have no obligation to preserve rights in the Collateral against any prior parties or to marshal any of the Collateral for the benefit of any Person; (iv) nothing in this Agreement shall impair or adversely affect the manner or timing with which the Senior Lender enforces any of its security; (vi) nothing in this Agreement shall impair or adversely affect any right, privilege, power or remedy of the Senior Lender with respect to the Senior Debt, the Borrower, any Co-Borrower or any assets of the Borrower or any Co-Borrower, including without limitation, the Senior Lender's right to (x) waive or release any of the Senior Lender's security or rights, (y) waive or ignore any defaults by the Borrower or any Co-Borrower; and/or (z) restructure, renew, modify, or supplement the Senior Debt or any portion thereof or any agreement with the Borrower or any Co-Borrower relating to the Senior Debt or to increase the outstanding principal amount of the Senior Debt by extending additional credit to the Borrower or any Co-Borrower; and (vi) nothing contained herein is intended to alter or deprive the Senior Lender of any of its rights as the senior secured creditor of the Borrower and the Co-Borrowers to collect or otherwise foreclose upon any of the Borrower's assets.

### Section 11.    <u>Instrument Legend.</u>

Any instrument evidencing any of the Junior Debt (including, without limitation, the Junior Notes), or any portion thereof, will, on the date hereof, have affixed to it a document conspicuously indicating that payment thereof is subordinated to the claims of the Senior Creditor pursuant to the terms of this Agreement: "THIS INSTRUMENT IS SUBJECT TO THE TERMS OF A SUBORDINATION AGREEMENT DATED AS OF OCTOBER 27, 2005 BY

AND BETWEEN THE HOLDER HEREOF AND WACHOVIA BANK, NATIONAL ASSOCIATION." Any instruments evidencing any of the Junior Debt, or any portion thereof, which is hereafter executed by the Borrower or any Co-Borrower, will, on the date thereof, be inscribed with the aforesaid legend, and copies of such instrument will be delivered to the Senior Lender on the date of its execution or within five (5) business days thereafter and the original of such instrument will be delivered to the Senior Lender upon request therefore to the Senior Lender after the occurrence of a Senior Event of Default.

**Section 12.**     **Representations and Warranties.**

Each of the parties hereto hereby represents and warrants that (i) it has full power, authority and legal right to make and perform this Agreement and (ii) this Agreement is its legal, valid, and binding obligation, enforceable against it in accordance with its terms.

**Section 13.**     **Amendment.** Neither this Agreement nor any of the terms hereof may be amended, waived, discharged, or terminated unless such amendment, waiver, discharge, or termination is in writing signed by the Senior Lender and the Junior Lender.

**Section 14.**     **Successors and Assigns.** This Agreement and the terms, covenants, and conditions hereof shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and assigns, and neither the Senior Debt nor the Junior Debt shall be sold, assigned, or transferred unless the assignee or transferee thereof expressly takes such debt subject to and agrees to be bound by the terms and conditions of this Agreement.

**Section 15.**     **Governing Law.** This Agreement will be construed in accordance with and governed by the law of the State of Florida, without regard to the choice of law principles thereof.

**Section 16.**     **Notices.** Whenever it is provided herein that any notice, demand, request, consent, approval, declaration, or other communication shall or may be given to or served upon any of the parties by another, or whenever any of the parties desires to give or serve upon another any such communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration, or other communication shall be in writing and shall be deemed to have been duly given and received, for purposes hereof, when (i) delivered by hand, (ii) four days after being deposited in the mail, postage prepaid, and (iii) one Business Day after having been sent by reputable overnight courier, in each case addressed as set forth on Annex I hereto or at such address as may be substituted by notice given as herein provided. Failure to delay in delivering copies of any communication to the persons designated to receive copies shall in no way adversely affect the effectiveness of such communication.

**Section 17.**     **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**Section 18.**     **Final Agreement.** THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO ORAL AGREEMENTS BETWEEN THE PARTIES.

JACK_508858.2

**Section 19.    WAIVER OF JURY TRIAL.**    TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE SENIOR LENDER, THE JUNIOR LENDER AND THE BORROWERS HEREBY IRREVOCABLY AND EXPRESSLY WAIVE ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED THEREBY OR THE ACTIONS OF THE SENIOR LENDER OR THE JUNIOR LENDER IN THE NEGOTIATION, ADMINISTRATION OR ENFORCEMENT HEREOF.

[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY; SIGNATURES PAGES FOLLOW.]

IN WITNESS WHEREOF, the parties hereto have caused this Subordination Agreement to be duly executed by their proper and duly authorized officers as of the day and year first above written.

**SENIOR LENDER:**

WACHOVIA BANK, NATIONAL
ASSOCIATION

By: _____
Its: _____SVP_____

**JUNIOR LENDERS:**

CAMOFI MASTER LDC

By: _Jeffrey M. Haas_____
Its: _Authorized Signatory_____

**BORROWERS:**

GLOBAL AXCESS CORP.

By: _____
Its: _____CFO_____

NATIONWIDE MONEY SERVICES, INC.

By: _____
Its: _____CFO_____

EFT INTEGRATION, INC.

By: _____
Its: _____CFO_____

JACK_508858.2

AXCESS TECHNOLOGY CORPORATION

By: _____

Its: _____

## ANNEX I
## ADDRESSES FOR NOTICE

**enior Lender**

Wachovia Bank, National Association
25 Water Street
Jacksonville, FL 32231
Attn: John Whitner

with a copy to:

Foley & Lardner LLP
300 Independent Drive, Suite 1300
Jacksonville, Florida 32202
Attn: Charles V. Hedrick

**Junior Lender**

CAMOFI Master LDC
c/o Centrecourt Asset Management
350 Madison Avenue
New York NY 10017
Attn: Keith D. Wellner, General Counsel

with a copy to:

**Borrowers**

Global Axcess Corp
224 Ponte Vedra Park Drive
Jacksonville, FL 32082
Attn: David J. Surette

with a copy to:

Smith, Gambrell & Russell, LLP
Bank of America Tower
50 North Laura Street
Suite #2600
Jacksonville, FL 32202
Attn: Steve Brust

JACK_508858.2

# EXHIBIT B

**EXHIBIT A**

NEITHER THIS SECURITY NOR THE SECURITIES INTO WHICH THIS SECURITY IS CONVERTIBLE HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS AS EVIDENCED BY A LEGAL OPINION OF COUNSEL TO THE TRANSFEROR TO SUCH EFFECT, THE SUBSTANCE OF WHICH SHALL BE REASONABLY ACCEPTABLE TO THE COMPANY. THIS SECURITY AND THE SECURITIES ISSUABLE UPON CONVERSION OF THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN SECURED BY SUCH SECURITIES.

Original Issue Date: October 27, 2005
Original Conversion Price (subject to adjustment herein): $1.45

$3,500,000

## 9% SENIOR SUBORDINATED SECURED CONVERTIBLE NOTE
## DUE OCTOBER 27, 2010

THIS NOTE is duly authorized and issued 9% Secured Convertible Notes of **Global Axcess Corp.**, a Nevada corporation, having a principal place of business at 224 Ponte Vedra Park Drive, Ponte Vedra Beach, Florida 32802 (the "Company"), designated as its 9% Senior Subordinated Secured Convertible Notes, due October 27, 2010 (the "Note(s)").

FOR VALUE RECEIVED, the Company promises to pay to **CAMOFI Master LDC** or its registered assigns (the "Holder"), the principal sum of $3,500,000 on October 27, 2010 or such earlier date as the Notes are required or permitted to be repaid as provided hereunder (the "Maturity Date"), and to pay interest to the Holder on the aggregate unconverted and then outstanding principal amount of this Note in accordance with the provisions hereof. This Note is subject to the following additional provisions:

Section 1.    Definitions. For the purposes hereof, in addition to the terms defined elsewhere in this Note: (a) capitalized terms not otherwise defined herein have the meanings given to such terms in the Purchase Agreement, and (b) the following terms shall have the following meanings:

"Alternate Consideration" shall have the meaning set forth in Section 5(e)(iii).

"Business Day" means any day except Saturday, Sunday and any day which shall be a federal legal holiday in the United States or a day on which banking institutions in the State of New York are authorized or required by law or other government action to close.

"Change of Control Transaction" means the occurrence after the date hereof, of any of (i) an acquisition after the date hereof by an individual or legal entity or "group" (as described in Rule 13d-5(b)(1) promulgated under the Exchange Act) of effective control (whether through

legal or beneficial ownership of capital stock of the Company, by contract or otherwise) of in excess of 33% of the voting securities of the Company, (ii) a replacement at one time or within a three year period of more than one-half of the members of the Company's board of directors which is not approved by a majority of those individuals who are members of the board of directors on the date hereof (or by those individuals who are serving as members of the board of directors on any date whose nomination to the board of directors was approved by a majority of the members of the board of directors who are members on the date hereof), (iii) Michael Dodak shall no longer be employed on a full time basis by the Company or (iv) the execution by the Company of an agreement to which the Company is a party or by which it is bound, providing for any of the events set forth above in (i), (ii) or (iii).

"Common Stock" means the common stock, $0.001 par value, of the Company and stock of any other class into which such shares may hereafter have been reclassified or changed.

"Conversion Date" shall have the meaning set forth in Section 4(a) hereof.

"Conversion Price" shall have the meaning set forth in Section 4(b).

"Conversion Shares" means the shares of Common Stock issuable upon conversion of Notes or as payment of interest in accordance with the terms hereof.

"Effectiveness Date" shall have the meaning given to such term in the Registration Rights Agreement.

"Effectiveness Period" shall have the meaning given to such term in the Registration Rights Agreement.

"Equity Conditions" shall mean, during the period in question, (i) the Company shall have duly honored all conversions and redemptions scheduled to occur or occurring by virtue of one or more Notice of Conversions, if any, (ii) all liquidated damages and other amounts owing in respect of the Notes shall have been paid; (iii) there is an effective Registration Statement pursuant to which the Holder is permitted to utilize the prospectus thereunder to resell all of the shares issuable pursuant to the Transaction Documents (and the Company believes, in good faith, that such effectiveness will continue uninterrupted for the foreseeable future), (iv) the Common Stock is trading on the Trading Market and all of the shares issuable pursuant to the Transaction Documents are listed for trading on a Trading Market (and the Company believes, in good faith, that trading of the Common Stock on a Trading Market will continue uninterrupted for the foreseeable future), (v) there is a sufficient number of authorized but unissued and otherwise unreserved shares of Common Stock for the issuance of all of the shares issuable pursuant to the Transaction Documents, (vi) there is then existing no Event of Default or event which, with the passage of time or the giving of notice, would constitute an Event of Default, (vii) all of the shares issued or issuable pursuant to the transaction proposed would not violate the limitations set forth in Section 4(d), (viii) no public announcement of a pending or proposed Fundamental Transaction, Change of Control Transaction or acquisition transaction has occurred that has not been consummated and (ix) the closing price for the Common Stock is at least 115% of the Conversion Price (as adjusted).

"Event of Default" shall have the meaning set forth in Section 8.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Fundamental Transaction" shall have the meaning set forth in Section 5(e)(iii) hereof.

"Late Fees" shall have the meaning set forth in the second paragraph to this Note.

"Mandatory Prepayment Amount" for any Notes shall equal the sum of (i) 110% of the principal amount of Notes to be prepaid, plus all accrued and unpaid interest thereon, and (ii) all other amounts, costs, expenses and liquidated damages due in respect of such Notes.

"Original Issue Date" shall mean the date of the first issuance of the Notes regardless of the number of transfers of any Note and regardless of the number of instruments which may be issued to evidence such Note.

"Person" means a corporation, an association, a partnership, organization, a business, an individual, a government or political subdivision thereof or a governmental agency.

"Purchase Agreement" means the Securities Purchase Agreement, dated as of October 27, 2005, to which the Company and the original Holders are parties, as amended, modified or supplemented from time to time in accordance with its terms.

"Registration Rights Agreement" means the Registration Rights Agreement, dated as of the date of the Purchase Agreement, to which the Company and the original Holders are parties, as amended, modified or supplemented from time to time in accordance with its terms.

"Registration Statement" means a registration statement meeting the requirements set forth in the Registration Rights Agreement, covering among other things the resale of the Conversion Shares and naming the Holders as "selling stockholders" thereunder.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Subsidiary" shall have the meaning given to such term in the Purchase Agreement.

"Trading Day" means a day on which the Common Stock is traded on a Trading Market.

"Trading Market" means the following markets or exchanges on which the Common Stock is listed or quoted for trading on the date in question: the Nasdaq SmallCap Market, the American Stock Exchange, the New York Stock Exchange, the Nasdaq National Market or the OTC Bulletin Board.

"Transaction Documents" shall have the meaning set forth in the Purchase Agreement.

"VWAP" means, for any date, the price determined by the first of the following clauses that applies: (a) if the Common Stock is then listed or quoted on a Trading Market, the daily volume weighted average price of the Common Stock for such date (or the nearest preceding date) on the primary Trading Market on which the Common Stock is then listed or quoted as reported by Bloomberg Financial L.P. (based on a Trading Day from 9:30 a.m. EST to 4:02 p.m. Eastern Time) using the VAP function; (b) if the Common Stock is not then listed or quoted on the Trading Market and if prices for the Common Stock are then reported in the "Pink Sheets" published by the Pink Sheets, LLC (or a similar organization or agency succeeding to its functions of reporting prices), the most recent bid price per share of the Common Stock so

reported; or (c) in all other cases, the fair market value of a share of Common Stock as determined by a nationally recognized-independent appraiser selected in good faith by Holders holding a majority of the principal amount of Notes then outstanding.

Section 2.    Interest.

    a)    Payment of Interest in Cash. The Company shall pay interest to the Holder on the aggregate unconverted and then outstanding principal amount of this Note at the rate of 9% per annum, payable monthly in arrears beginning on the first day of the first month after the Original Issue Date and on each Conversion Date (as to that principal amount then being converted) and on the Maturity Date (except that, if any such date is not a Business Day, then such payment shall be due on the next succeeding Business Day; each such date, an "Interest Payment Date"), in cash.

    b)    Reserved.

    c)    Interest Calculations. Interest shall be calculated on the basis of a 360-day year and shall accrue daily commencing on the Original Issue Date until payment in full of the principal sum, together with all accrued and unpaid interest and other amounts which may become due hereunder, has been made. Interest shall be compounded monthly. Payment of interest in shares of Common Stock shall otherwise occur pursuant to Section 4(e)(ii) and only for purposes of the payment of interest in shares, the Interest Payment Date shall be deemed the Conversion Date. Interest shall cease to accrue with respect to any principal amount converted, provided that the Company in fact delivers the Conversion Shares within the time period required by Section 4(d)(ii). Interest hereunder will be paid to the Person in whose name this Note is registered on the records of the Company regarding registration and transfers of Notes (the "Note Register"). Except as otherwise provided herein, if at any time the Company pays interest partially in cash and partially in shares of Common Stock, then such payment shall be distributed ratably among the Holders based upon the principal amount of Notes held by each Holder.

    d)    Late Fee.  All overdue accrued and unpaid interest to be paid hereunder shall entail a late fee at the rate of 20% per annum (or such lower maximum amount of interest permitted to be charged under applicable law) ("Late Fee") which will accrue daily, from the date such interest is due hereunder through and including the date of payment. Notwithstanding anything to the contrary contained herein, if on any Interest Payment Date the Company has elected to pay interest in Common Stock and is not able to pay accrued interest in the form of Common Stock because it does not then satisfy the conditions for payment in the form of Common Stock set forth above, then, at the option of the Holder, the Company, in lieu of delivering either shares of Common Stock pursuant to this Section 2 or paying the regularly scheduled cash interest payment, shall deliver, within three Trading Days of each applicable Interest Payment Date, an amount in cash equal to the product of the number of shares of Common Stock otherwise deliverable to the Holder in connection with the payment of interest due on such Interest Payment Date and the highest VWAP during the period commencing on the Interest Payment Date and ending on the Trading Day prior to the date such payment is made.

    e)    Optional Prepayment.  The Company shall have the right to prepay, in cash, all or a portion of the Notes at any time at 110% of the principal amount thereof plus accrued interest to the date of repayment.

    f)    Mandatory Prepayment.  On the execution of a definitive agreement to sell more than 50% of the assets of the Company or upon a Change of Control Transaction, the Company

shall be required to prepay the Notes, in cash, at 110% of the principal amount thereof plus accrued interest to the date of repayment. This Mandatory Prepayment shall not apply to the sale of all of the stock or assets of Electronic Payment & Transfer Corp., EFT Integration Inc. and Cash Axcess Corp., the Company's wholly-owned subsidiaries, on terms satisfactory to the Holder.

Section 3.          Registration of Transfers and Exchanges.

a)    Different Denominations. This Note is exchangeable for an equal aggregate principal amount of Notes of different authorized denominations, as requested by the Holder surrendering the same. No service charge will be made for such registration of transfer or exchange.

b)    Investment Representations. This Note has been issued subject to certain investment representations of the original Holders set forth in the Purchase Agreement and may be transferred or exchanged only in compliance with the Purchase Agreement and applicable federal and state securities laws and regulations.

c)    Reliance on Note Register. Prior to due presentment to the Company for transfer of this Note, the Company and any agent of the Company may treat the Person in whose name this Note is duly registered on the Note Register as the owner hereof for the purpose of receiving payment as herein provided and for all other purposes, whether or not this Note is overdue, and neither the Company nor any such agent shall be affected by notice to the contrary.

Section 4.          Conversion.

a)    Voluntary Conversion. At any time after the Original Issue Date until this Note is no longer outstanding, this Note shall be convertible into shares of Common Stock at the option of the Holder, in whole or in part at any time and from time to time (subject to the limitations on conversion set forth in Section 4(d) hereof). The Holder shall effect conversions by delivering to the Company the form of Notice of Conversion attached hereto as Annex A (a "Notice of Conversion"), specifying therein the principal amount of Notes to be converted and the date on which such conversion is to be effected (a "Conversion Date"). If no Conversion Date is specified in a Notice of Conversion, the Conversion Date shall be the date that such Notice of Conversion is provided hereunder. To effect conversions hereunder, the Holder shall not be required to physically surrender Notes to the Company unless the entire principal amount of this Note plus all accrued and unpaid interest thereon has been so converted. Conversions hereunder shall have the effect of lowering the outstanding principal amount of this Note in an amount equal to the applicable conversion. The Holder and the Company shall maintain records showing the principal amount converted and the date of such conversions. The Company shall deliver any objection to any Notice of Conversion within 3 Business Days of receipt of such notice. In the event of any dispute or discrepancy, the records of the Holder shall be controlling and determinative in the absence of manifest error. The Holder and any assignee, by acceptance of this Note, acknowledge and agree that, by reason of the provisions of this paragraph, following conversion of a portion of this Note, the unpaid and unconverted principal amount of this Note may be less than the amount stated on the face hereof. However, at the Company's request, the Holder shall surrender the Note to the Company within five (5) Trading Days following such request so that a new Note reflecting the correct principal amount may be issued to Holder.

b)    Conversion Price. The conversion price in effect on any Conversion Date shall be $1.45, subject to adjustment herein.

c)    Mandatory Conversion. At any time after the Original Issue Date, provided that the Equity Conditions are met, in the event that the average daily trading volume exceeds 300,000 shares and such amount to be converted would not exceed 25% of the volume for any of the previous 10 Trading Days (each subject to adjustment for stock splits, reclassifications, combinations and similar adjustments) for the 20 consecutive Trading Days immediately prior to the Mandatory Conversion Notice Date (as defined below), unless the Holder is prohibited from converting the Notes pursuant to Section 4(d) below, the Company shall have the right to deliver a notice to the Holder (a "Mandatory Conversion Notice" and the date such notice is received by the Holder, the "Mandatory Conversion Notice Date") then the Company shall be able to require the Holder to convert the percentage of the aggregate principal amount of the Notes outstanding in the following amounts:

   i.    If the VWAP of the Common Stock (subject to adjustment for stock splits, reclassifications, combinations and similar adjustments) exceeds 150% of the initial Conversion Price (i.e. $2.18 per share) for 20 consecutive Trading Days, 25% of the Notes outstanding;

   ii.   If the VWAP of the Common Stock (subject to adjustment for stock splits, reclassifications, combinations and similar adjustments) exceeds 200% of the initial Conversion Price (i.e. $2.90 per share) for 20 consecutive Trading Days, an additional 25% of the Notes outstanding, provided that such conversion shall not result in excess of 50% of the original aggregate principal amount of the Notes being converted;

   iii.  If the VWAP of the Common Stock (subject to adjustment for stock splits, reclassifications, combinations and similar adjustments) exceeds 250% of the initial Conversion Price (i.e. $3.63 per share) for 20 consecutive Trading Days, an additional 25% of the Notes outstanding, provided that such conversion shall not result in excess of 75% of the original aggregate principal amount of the Notes being converted; and

   iv.   If the VWAP of the Common Stock (subject to adjustment for stock splits, reclassifications, combinations and similar adjustments) exceeds 300% of the initial Conversion Price (i.e. $4.35 per share) for 20 consecutive Trading Days, 100% of the Notes outstanding;

d)    Conversion Limitations; Holder's Restriction on Conversion. The Company shall not effect any conversion of this Note, and the Holder shall not have the right to convert any portion of this Note, pursuant to Section 4(a) or otherwise, to the extent that after giving effect to such conversion, the Holder (together with the Holder's affiliates), as set forth on the applicable Notice of Conversion, would beneficially own in excess of 4.99% of the number of shares of the Common Stock outstanding immediately after giving effect to such conversion. For purposes of the foregoing sentence, the number of shares of Common Stock beneficially owned by the Holder and its affiliates shall include the number of shares of Common Stock issuable upon conversion of this Note with respect to which the determination of such sentence is being made, but shall exclude the number of shares of Common Stock which would be issuable upon (A) conversion of the remaining, nonconverted portion of this Note beneficially owned by the Holder or any of its affiliates and (B) exercise or conversion of the unexercised or nonconverted portion of any other securities of the Company (including, without limitation, any other Notes or the Warrants) subject to a limitation on conversion or exercise analogous to the limitation contained herein beneficially

owned by the Holder or any of its affiliates. Except as set forth in the preceding sentence, for purposes of this Section 4(c), beneficial ownership shall be calculated in accordance with Section 13(d) of the Exchange Act. To the extent that the limitation contained in this section applies, the determination of whether this Note is convertible (in relation to other securities owned by the Holder) and of which a portion of this Note is convertible shall be in the sole discretion of such Holder. To ensure compliance with this restriction, the Holder will be deemed to represent to the Company each time it delivers a Notice of Conversion that such Notice of Conversion has not violated the restrictions set forth in this paragraph and the Company shall have no obligation to verify or confirm the accuracy of such determination. For purposes of this Section 4(c), in determining the number of outstanding shares of Common Stock, the Holder may rely on the number of outstanding shares of Common Stock as reflected in (x) the Company's most recent Form 10-QSB or Form 10-KSB (or such related form), as the case may be, (y) a more recent public announcement by the Company or (z) any other notice by the Company or the Company's Transfer Agent setting forth the number of shares of Common Stock outstanding. Upon the written or oral request of the Holder, the Company shall within two Trading Days confirm orally and in writing to the Holder the number of shares of Common Stock then outstanding. In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of securities of the Company, including this Note, by the Holder or its affiliates since the date as of which such number of outstanding shares of Common Stock was reported. The provisions of this Section 4(c) may be waived by the Holder upon, at the election of the Holder, not less than 61 days' prior notice to the Company, and the provisions of this Section 4(d) shall continue to apply until such 61st day (or such later date, as determined by the Holder, as may be specified in such notice of waiver).

e)    Mechanics of Conversion

i.    Conversion Shares Issuable Upon Conversion of Principal Amount. The number of shares of Common Stock issuable upon a conversion hereunder shall be determined by the quotient obtained by dividing (x) the outstanding principal amount of this Note to be converted by (y) the Conversion Price.

ii.    Delivery of Certificate Upon Conversion. Not later than three Trading Days after any Conversion Date, the Company will deliver to the Holder (A) a certificate or certificates representing the Conversion Shares which shall be free of restrictive legends and trading restrictions (other than those required by the Purchase Agreement) representing the number of shares of Common Stock being acquired upon the conversion of Notes (including, if so timely elected by the Company, shares of Common Stock representing the payment of accrued interest) and (B) a bank check in the amount of accrued and unpaid interest (if the Company is required to pay accrued interest in cash). The Company shall, if available and if allowed under applicable securities laws, use its best efforts to deliver any certificate or certificates required to be delivered by the Company under this Section electronically through the Depository Trust Corporation or another established clearing corporation performing similar functions.

iii.    Failure to Deliver Certificates. If in the case of any Notice of Conversion such certificate or certificates are not delivered to or as directed by the applicable Holder by the third Trading Day after a Conversion Date, the Holder shall be entitled by written notice to the Company at any time on or before its receipt of such certificate or certificates thereafter, to rescind such conversion, in which event the Company shall immediately return the certificates representing the principal amount of Notes tendered for conversion.

iv.      Obligation Absolute; Partial Liquidated Damages.  If the Company fails for any reason to deliver to the Holder such certificate or certificates pursuant to Section 4(d)(ii) by the third Trading Day after the Conversion Date, the Company shall pay to such Holder, in cash, as liquidated damages and not as a penalty, for each $1000 of principal amount being converted, $10 per Trading Day (increasing to $20 per Trading Day after 5 Trading Days after such damages begin to accrue) for each Trading Day after such third Trading Day until such certificates are delivered.  The Company's obligations to issue and deliver the Conversion Shares upon conversion of this Note in accordance with the terms hereof are absolute and unconditional, irrespective of any action or inaction by the Holder to enforce the same, any waiver or consent with respect to any provision hereof, the recovery of any judgment against any Person or any action to enforce the same, or any setoff, counterclaim, recoupment, limitation or termination, or any breach or alleged breach by the Holder or any other Person of any obligation to the Company or any violation or alleged violation of law by the Holder or any other person, and irrespective of any other circumstance which might otherwise limit such obligation of the Company to the Holder in connection with the issuance of such Conversion Shares; provided, however, such delivery shall not operate as a waiver by the Company of any such action the Company may have against the Holder.  In the event a Holder of this Note shall elect to convert any or all of the outstanding principal amount hereof, the Company may not refuse conversion based on any claim that the Holder or any one associated or affiliated with the Holder of has been engaged in any violation of law, agreement or for any other reason, unless, an injunction from a court, on notice, restraining and or enjoining conversion of all or part of this Note shall have been sought and obtained and the Company posts a surety bond for the benefit of the Holder in the amount of 150% of the principal amount of this Note outstanding, which is subject to the injunction, which bond shall remain in effect until the completion of arbitration/litigation of the dispute and the proceeds of which shall be payable to such Holder to the extent it obtains judgment. In the absence of an injunction precluding the same, the Company shall issue Conversion Shares or, if applicable, cash, upon a properly noticed conversion.  Nothing herein shall limit a Holder's right to pursue actual damages or declare an Event of Default pursuant to Section 8 herein for the Company's failure to deliver Conversion Shares within the period specified herein and such Holder shall have the right to pursue all remedies available to it at law or in equity including, without limitation, a decree of specific performance and/or injunctive relief.  The exercise of any such rights shall not prohibit the Holders from seeking to enforce damages pursuant to any other Section hereof or under applicable law.

v.      Compensation for Buy-In on Failure to Timely Deliver Certificates Upon Conversion. In addition to any other rights available to the Holder, if the Company fails for any reason to deliver to the Holder such certificate or certificates pursuant to Section 4(d)(ii) by the third Trading Day after the Conversion Date, and if after such third Trading Day the Holder is required by its brokerage firm to purchase (in an open market transaction or otherwise) Common Stock to deliver in satisfaction of a sale by such Holder of the Conversion Shares which the Holder anticipated receiving upon such conversion (a "Buy-In"), then the Company shall (A) pay in cash to the Holder (in addition to any remedies available to or elected by the Holder) the amount by which (x) the Holder's total purchase price (including brokerage commissions, if any) for the Common Stock so purchased exceeds (y) the product of (1) the aggregate number of shares of Common Stock that such Holder anticipated receiving from the conversion at issue multiplied by (2) the actual sale price of the Common Stock at the time of the sale

(including brokerage commissions, if any) giving rise to such purchase obligation and (B) at the option of the Holder, either reissue Notes in principal amount equal to the principal amount of the attempted conversion or deliver to the Holder the number of shares of Common Stock that would have been issued had the Company timely complied with its delivery requirements under Section 4(e)(ii).  For example, if the Holder purchases Common Stock having a total purchase price of $11,000 to cover a Buy-In with respect to an attempted conversion of Notes with respect to which the actual sale price of the Conversion Shares at the time of the sale (including brokerage commissions, if any) giving rise to such purchase obligation was a total of $10,000 under clause (A) of the immediately preceding sentence, the Company shall be required to pay the Holder $1,000.  The Holder shall provide the Company written notice indicating the amounts payable to the Holder in respect of the Buy-In.  Notwithstanding anything contained herein to the contrary, if a Holder requires the Company to make payment in respect of a Buy-In for the failure to timely deliver certificates hereunder and the Company timely pays in full such payment, the Company shall not be required to pay such Holder liquidated damages under Section 4(d)(iv) in respect of the certificates resulting in such Buy-In.

vi.    <u>Reservation of Shares Issuable Upon Conversion</u>. The Company covenants that it will at all times reserve and keep available out of its authorized and unissued shares of Common Stock solely for the purpose of issuance upon conversion of the Notes and payment of interest on the Note, each as herein provided, free from preemptive rights or any other actual contingent purchase rights of persons other than the Holders, not less than such number of shares of the Common Stock as shall (subject to any additional requirements of the Company as to reservation of such shares set forth in the Purchase Agreement) be issuable (taking into account the adjustments and restrictions of Section 5) upon the conversion of the outstanding principal amount of the Notes and payment of interest hereunder. The Company covenants that all shares of Common Stock that shall be so issuable shall, upon issue, be duly and validly authorized, issued and fully paid, nonassessable and, if the Registration Statement is then effective under the Securities Act, registered for public sale in accordance with such Registration Statement.

vii.    <u>Fractional Shares</u>. Upon a conversion hereunder the Company shall not be required to issue stock certificates representing fractions of shares of the Common Stock, but may if otherwise permitted, make a cash payment in respect of any final fraction of a share based on the VWAP at such time.  If the Company elects not, or is unable, to make such a cash payment, the Holder shall be entitled to receive, in lieu of the final fraction of a share, one whole share of Common Stock.

viii.    <u>Transfer Taxes</u>.  The issuance of certificates for shares of the Common Stock on conversion of the Notes shall be made without charge to the Holders thereof for any documentary stamp or similar taxes that may be payable in respect of the issue or delivery of such certificate, provided that the Company shall not be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of any such certificate upon conversion in a name other than that of the Holder of such Notes so converted and the Company shall not be required to issue or deliver such certificates unless or until the person or persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

<u>Section 5.</u>    <u>Certain Adjustments.</u>

a)      Stock Dividends and Stock Splits.  If the Company, at any time while the Notes are outstanding: (A) shall pay a stock dividend or otherwise make a distribution or distributions on shares of its Common Stock or any other equity or equity equivalent securities payable in shares of Common Stock (which, for avoidance of doubt, shall not include any shares of Common Stock issued by the Company pursuant to this Note, including as interest thereon), (B) subdivide outstanding shares of Common Stock into a larger number of shares, (C) combine (including by way of reverse stock split) outstanding shares of Common Stock into a smaller number of shares, or (D) issue by reclassification of shares of the Common Stock any shares of capital stock of the Company, then the Conversion Price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock (excluding treasury shares, if any) outstanding before such event and of which the denominator shall be the number of shares of Common Stock outstanding after such event.  Any adjustment made pursuant to this Section shall become effective immediately after the record date for the determination of stockholders entitled to receive such dividend or distribution and shall become effective immediately after the effective date in the case of a subdivision, combination or re-classification.

b)      Subsequent Equity Sales.  Except for the Current offering, if the Company or any Subsidiary thereof, as applicable, at any time while this Note is outstanding, shall offer, sell, grant any option to purchase or offer, sell or grant any right to reprice its securities, or otherwise dispose of or issue (or announce any offer, sale, grant or any option to purchase or other disposition) any Common Stock or Common Stock Equivalents entitling any Person to acquire shares of Common Stock, at an effective price per share less than the then Conversion Price (such lower price, the "Base Share Price" and such issuances collectively, a "Dilutive Issuance"), as adjusted hereunder (if the holder of the Common Stock or Common Stock Equivalents so issued shall at any time, whether by operation of purchase price adjustments, reset provisions, floating conversion, exercise or exchange prices or otherwise, or due to warrants, options or rights per share which is issued in connection with such issuance, be entitled to receive shares of Common Stock at an effective price per share which is less than the Conversion Price, such issuance shall be deemed to have occurred for less than the Conversion Price), then, the Conversion Price shall be reduced to equal the Base Share Price and the number of Conversion Shares issuable hereunder shall be increased.  Such adjustment shall be made whenever such Common Stock or Common Stock Equivalents are issued.  The Company shall notify the Holder in writing, no later than the Trading Day following the issuance of any Common Stock or Common Stock Equivalents subject to this section, indicating therein the applicable issuance price, or of applicable reset price, exchange price, conversion price and other pricing terms (such notice the "Dilutive Issuance Notice").  For purposes of clarification, whether or not the Company provides a Dilutive Issuance Notice pursuant to this Section 3(b), upon the occurrence of any Dilutive Issuance, after the date of such Dilutive Issuance the Holder is entitled to receive a number of Conversion Shares based upon the Base Share Price regardless of whether the Holder accurately refers to the Base Share Price in the Notice of Conversion.

c)      Pro Rata Distributions. If the Company, at any time while Notes are outstanding, shall distribute to all holders of Common Stock (and not to Holders) evidences of its indebtedness or assets or rights or warrants to subscribe for or purchase any security, then in each such case the Conversion Price shall be determined by multiplying such Conversion Price in effect immediately prior to the record date fixed for determination of stockholders entitled to receive such distribution by a fraction of which the denominator shall be the VWAP determined as of the record date mentioned above, and of which the numerator shall be such VWAP on such record date less the then fair market value at such record date of the portion of such assets or evidence of indebtedness so distributed applicable to one outstanding share of the Common Stock as

determined by the Board of Directors in good faith. In either case the adjustments shall be described in a statement provided to the Holders of the portion of assets or evidences of indebtedness so distributed or such subscription rights applicable to one share of Common Stock. Such adjustment shall be made whenever any such distribution is made and shall become effective immediately after the record date mentioned above.

d)    Calculations.  All calculations under this Section 5 shall be made to the nearest cent or the nearest 1/100th of a share, as the case may be. The number of shares of Common Stock outstanding at any given time shall not includes shares of Common Stock owned or held by or for the account of the Company, and the description of any such shares of Common Stock shall be considered on issue or sale of Common Stock. For purposes of this Section 5, the number of shares of Common Stock deemed to be issued and outstanding as of a given date shall be the sum of the number of shares of Common Stock (excluding treasury shares, if any) issued and outstanding.

e)    Notice to Holders.

i.    Adjustment to Conversion Price.  Whenever the Conversion Price is adjusted pursuant to any of this Section 5, the Company shall promptly mail to each Holder a notice setting forth the Conversion Price after such adjustment and setting forth a brief statement of the facts requiring such adjustment. If the Company issues a variable rate security, despite the prohibition thereon in the Purchase Agreement, the Company shall be deemed to have issued Common Stock or Common Stock Equivalents at the lowest possible conversion or exercise price at which such securities may be converted or exercised in the case of a Variable Rate Transaction (as defined in the Purchase Agreement), or the lowest possible adjustment price in the case of an MFN Transaction (as defined in the Purchase Agreement).

ii.    Notice to Allow Conversion by Holder.  If (A) the Company shall declare a dividend (or any other distribution) on the Common Stock; (B) the Company shall declare a special nonrecurring cash dividend on or a redemption of the Common Stock; (C) the Company shall authorize the granting to all holders of the Common Stock rights or warrants to subscribe for or purchase any shares of capital stock of any class or of any rights; (D) the approval of any stockholders of the Company shall be required in connection with any reclassification of the Common Stock, any consolidation or merger to which the Company is a party, any sale or transfer of all or substantially all of the assets of the Company, of any compulsory share exchange whereby the Common Stock is converted into other securities, cash or property; (E) the Company shall authorize the voluntary or involuntary dissolution, liquidation or winding up of the affairs of the Company; then, in each case, the Company shall cause to be filed at each office or agency maintained for the purpose of conversion of the Notes, and shall cause to be mailed to the Holders at their last addresses as they shall appear upon the stock books of the Company, at least 20 calendar days prior to the applicable record or effective date hereinafter specified, a notice stating (x) the date on which a record is to be taken for the purpose of such dividend, distribution, redemption, rights or warrants, or if a record is not to be taken, the date as of which the holders of the Common Stock of record to be entitled to such dividend, distributions, redemption, rights or warrants are to be determined or (y) the date on which such reclassification, consolidation, merger, sale, transfer or share exchange is expected to become effective or close, and the date as of which it is expected that holders of the Common Stock of record shall be entitled to exchange their shares of the Common Stock for securities, cash or other property deliverable upon such

reclassification, consolidation, merger, sale, transfer or share exchange; provided, that the failure to mail such notice or any defect therein or in the mailing thereof shall not affect the validity of the corporate action required to be specified in such notice. Holders are entitled to convert Notes during the 20-day period commencing the date of such notice to the effective date of the event triggering such notice.

iii.    Fundamental Transaction. If, at any time while this Note is outstanding, (A) the Company effects any merger or consolidation of the Company with or into another Person, (B) the Company effects any sale of all or substantially all of its assets in one or a series of related transactions, (C) any tender offer or exchange offer (whether by the Company or another Person) is completed pursuant to which holders of Common Stock are permitted to tender or exchange their shares for other securities, cash or property, or (D) the Company effects any reclassification of the Common Stock or any compulsory share exchange pursuant to which the Common Stock is effectively converted into or exchanged for other securities, cash or property (in any such case, a "Fundamental Transaction"), then upon any subsequent conversion of this Note, the Holder shall have the right to receive, for each Conversion Share that would have been issuable upon such conversion absent such Fundamental Transaction, the same kind and amount of securities, cash or property as it would have been entitled to receive upon the occurrence of such Fundamental Transaction if it had been, immediately prior to such Fundamental Transaction, the holder of one share of Common Stock (the "Alternate Consideration"). For purposes of any such conversion, the determination of the Conversion Price shall be appropriately adjusted to apply to such Alternate Consideration based on the amount of Alternate Consideration issuable in respect of one share of Common Stock in such Fundamental Transaction, and the Company shall apportion the Conversion Price among the Alternate Consideration in a reasonable manner reflecting the relative value of any different components of the Alternate Consideration. If holders of Common Stock are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Holder shall be given the same choice as to the Alternate Consideration it receives upon any conversion of this Note following such Fundamental Transaction. To the extent necessary to effectuate the foregoing provisions, any successor to the Company or surviving entity in such Fundamental Transaction shall issue to the Holder a new note consistent with the foregoing provisions and evidencing the Holder's right to convert such note into Alternate Consideration. The terms of any agreement pursuant to which a Fundamental Transaction is effected shall include terms requiring any such successor or surviving entity to comply with the provisions of this paragraph (c) and insuring that this Note (or any such replacement security) will be similarly adjusted upon any subsequent transaction analogous to a Fundamental Transaction.

iv.    Exempt Issuance. Notwithstanding the foregoing, no adjustment will be made under this Section 5 in respect of an Exempt Issuance.

Section 6.    Reserved.

Section 7.    Negative Covenants. So long as any portion of this Note is outstanding, the Company will not and will not permit any of its Subsidiaries to directly or indirectly:

a)    enter into, create, incur, assume or suffer to exist any indebtedness or liens of any kind (other than indebtedness and liens in favor of the Senior Lender), on or with respect to any

of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom that is senior to or pari passu with, in any respect, the Company's obligations under the Notes;

b)  amend its certificate of incorporation, bylaws or its charter documents so as to adversely affect any rights of the Holder;

c)  repay, repurchase or offer to repay, repurchase or otherwise acquire or make any dividend or distribution in respect of any of its Common Stock, Preferred Stock, or other equity securities other than as to the Conversion Shares to the extent permitted or required under the Transaction Documents;

d)  engage in any transactions with any officer, director, employee or any affiliate of the Company, including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Company, any entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee or partner, in each case in excess of $10,000 other than (i) for payment of salary or consulting fees for services rendered, (ii) reimbursement for expenses incurred on behalf of the Company and (iii) for other employee benefits, including stock option agreements under any stock option plan of the Company; or

create or acquire any Subsidiary after the date hereof unless (i) such Subsidiary is a wholly-owned Subsidiary of the Company and (ii) such Subsidiary becomes party to the Security Agreement and the Subsidiary Guaranty (either by executing a counterpart thereof or an assumption or joinder agreement in respect thereof) and satisfied each condition of this Agreement and the Transaction Documents as if such Subsidiary were a Subsidiary on the Closing Date;

f)  sell, transfer or otherwise dispose of any of its assets on terms where it is or may be leased to or re-acquired or acquired by the Company or any of its Subsidiaries;

g)  other than the sale of all of the stock or assets of Electronic Payment & Transfer Corp., EFT Integration Inc. and Cash Axcess Corp. SA, on terms satisfactory to the Holder, dispose, in a single transaction, or in a series of transactions all or any part of its assets unless such disposal is (i) in the ordinary course of business, (ii) for fair market value, (iii) for cash and (iv) approved by the board of directors of the Company;

h)  authorize or approve any reverse stock split of the Common Stock: or

i)  enter into any agreement with respect to any of the foregoing.

Section 8.    Events of Default.

a)  "Event of Default", wherever used herein, means any one of the following events (whatever the reason and whether it shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

i.  any default in the payment of (A) the principal of amount of any Note, or (B) interest (including Late Fees) on, or liquidated damages in respect of, any Note, in

13 of 21

each case free of any claim of subordination, as and when the same shall become due and payable (whether on a Conversion Date or the Maturity Date or by acceleration or otherwise) which default, solely in the case of an interest payment or other default under clause (B) above, is not cured, within 3 Trading Days;

ii.      the Company or any of its Subsidiaries shall fail to observe or perform any other covenant or agreement contained in this Note or any of the other Transaction Documents which failure is not cured, if possible to cure, within the earlier to occur of (A) 5 Trading Days after notice of such default sent by the Holder or by any other Holder and (B)10 Trading Days after the Company shall become or should have become aware of such failure;

iii.     a default or event of default (subject to any grace or cure period provided for in the applicable agreement, document or instrument) shall occur under (A) any of the Transaction Documents other than the Notes, or (B) any other material agreement, lease, document or instrument to which the Company or any Subsidiary is bound, which default, solely in the case of a default under clause (B) above, is not cured, within 10 Trading Days;

iv.      any representation or warranty made herein, in any other Transaction Document, in any written statement pursuant hereto or thereto, or in any other report, financial statement or certificate made or delivered to the Holder or any other holder of Notes shall be untrue or incorrect in any material respect as of the date when made or deemed made;

v.       (i) the Company or any of its Subsidiaries shall commence, or there shall be commenced against the Company or any such Subsidiary, a case under any applicable bankruptcy or insolvency laws as now or hereafter in effect or any successor thereto, or the Company or any Subsidiary commences any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to the Company or any Subsidiary thereof or (ii) there is commenced against the Company or any Subsidiary thereof any such bankruptcy, insolvency or other proceeding which remains undismissed for a period of 60 days; or (iii) the Company or any Subsidiary thereof is adjudicated by a court of competent jurisdiction insolvent or bankrupt; or any order of relief or other order approving any such case or proceeding is entered; or (iv) the Company or any Subsidiary thereof suffers any appointment of any custodian or the like for it or any substantial part of its property which continues undischarged or unstayed for a period of 60 days; or (v) the Company or any Subsidiary thereof makes a general assignment for the benefit of creditors; or (vi) the Company shall fail to pay, or shall state that it is unable to pay, or shall be unable to pay, its debts generally as they become due; or (vii) the Company or any Subsidiary thereof shall call a meeting of its creditors with a view to arranging a composition, adjustment or restructuring of its debts; or (viii) the Company or any Subsidiary thereof shall by any act or failure to act expressly indicate its consent to, approval of or acquiescence in any of the foregoing; or (ix) any corporate or other action is taken by the Company or any Subsidiary thereof for the purpose of effecting any of the foregoing;

vi.      the Company or any Subsidiary shall default in any of its obligations under any mortgage, credit agreement or other facility, indenture agreement, factoring agreement or other instrument under which there may be issued, or by which there may

be secured or evidenced any indebtedness for borrowed money or money due under any long term leasing or factoring arrangement of the Company in an amount exceeding $50,000, whether such indebtedness now exists or shall hereafter be created and such default shall result in such indebtedness becoming or being declared due and payable prior to the date on which it would otherwise become due and payable;

vii.    After the Registration Statement becomes effective, the Common Stock shall not be eligible for quotation on or quoted for trading on a Trading Market and shall not again be eligible for and quoted or listed for trading thereon within five Trading Days;

viii.    the Company shall be a party to any Change of Control Transaction or Fundamental Transaction, shall agree to sell or dispose of all or in excess of 33% of its assets in one or more transactions (whether or not such sale would constitute a Change of Control Transaction) or shall redeem or repurchase more than a de minimis number of its outstanding shares of Common Stock or other equity securities of the Company (other than redemptions of Conversion Shares and repurchases of shares of Common Stock or other equity securities of departing officers and directors of the Company; provided such repurchases shall not exceed $100,000, in the aggregate, for all officers and directors during the term of this Note);

ix.    if, during the Effectiveness Period (as defined in the Registration Rights Agreement), the effectiveness of the Registration Statement lapses for any reason or the Holder shall not be permitted to resell Registrable Securities (as defined in the Registration Rights Agreement) under the Registration Statement, in either case, for more than 10 consecutive Trading Days or 15 non-consecutive Trading Days during any 12 month period; provided, however, that in the event that the Company is negotiating a merger, consolidation, acquisition or sale of all or substantially all of its assets or a similar transaction and in the written opinion of counsel to the Company, the Registration Statement, would be required to be amended to include information concerning such transactions or the parties thereto that is not available or may not be publicly disclosed at the time, the Company shall be permitted an additional 10 consecutive Trading during any 12 month period relating to such an event;

x.    an Event (as defined in the Registration Rights Agreement) shall not have been cured to the satisfaction of the Holder prior to the expiration of thirty days from the Event Date (as defined in the Registration Rights Agreement) relating thereto (other than an Event resulting from a failure of an Registration Statement to be declared effective by the Commission on or prior to the Effectiveness Date (as defined in the Registration Rights Agreement), which shall be covered by Section 8(a)(ix);

xi.    the Company shall fail for any reason to deliver certificates to a Holder prior to the fifth Trading Day after a Conversion Date pursuant to and in accordance with Section 4(e) or the Company shall provide notice to the Holder, including by way of public announcement, at any time, of its intention not to comply with requests for conversions of any Notes in accordance with the terms hereof; or

xii.    the Company shall fail for any reason to pay in full the amount of cash due pursuant to a Buy-In within 5 Trading Days after notice therefor is delivered hereunder or shall fail to pay all amounts owed on account of an Event of Default within five days of the date due.

b)     Remedies Upon Event of Default. If any Event of Default occurs, the full principal amount of this Note, together with interest and other amounts owing in respect thereof, to the date of acceleration shall become, at the Holder's election, immediately due and payable in cash.   The aggregate amount payable upon an Event of Default shall be equal to the Mandatory Prepayment Amount.   Commencing 5 days after the occurrence of any Event of Default that results in the eventual acceleration of this Note, the interest rate on this Note shall accrue at the rate of 20% per annum, or such lower maximum amount of interest permitted to be charged under applicable law.   All Notes for which the full Mandatory Prepayment Amount hereunder shall have been paid in accordance herewith shall promptly be surrendered to or as directed by the Company.   The Holder need not provide and the Company hereby waives any presentment, demand, protest or other notice of any kind, and the Holder may immediately and without expiration of any grace period enforce any and all of its rights and remedies hereunder and all other remedies available to it under applicable law.   Such declaration may be rescinded and annulled by Holder at any time prior to payment hereunder and the Holder shall have all rights as a Note holder until such time, if any, as the full payment under this Section shall have been received by it.   No such rescission or annulment shall affect any subsequent Event of Default or impair any right consequent thereon.

Section 9.     Miscellaneous.

a)     Notices.   Any and all notices or other communications or deliveries to be provided by the Holders hereunder, including, without limitation, any Notice of Conversion, shall be in writing and delivered personally, by facsimile, sent by a nationally recognized overnight courier service, addressed to the Company, at the address set forth above, facsimile number _____, Attn: Michael Dodak, Chief Executive Officer, or such other address or facsimile number as the Company may specify for such purposes by notice to the Holders delivered in accordance with this Section.   Any and all notices or other communications or deliveries to be provided by the Company hereunder shall be in writing and delivered personally, by facsimile, sent by a nationally recognized overnight courier service addressed to each Holder at the facsimile telephone number or address of such Holder appearing on the books of the Company, or if no such facsimile telephone number or address appears, at the principal place of business of the Holder. Any notice or other communication or deliveries hereunder shall be deemed given and effective on the earliest of (i) the date of transmission, if such notice or communication is delivered via facsimile at the facsimile telephone number specified in this Section prior to 5:30 p.m. (New York City time), (ii) the date after the date of transmission, if such notice or communication is delivered via facsimile at the facsimile telephone number specified in this Section later than 5:30 p.m. (New York City time) on any date and earlier than 11:59 p.m. (New York City time) on such date, (iii) the second Business Day following the date of mailing, if sent by nationally recognized overnight courier service, or (iv) upon actual receipt by the party to whom such notice is required to be given.

b)     Absolute Obligation. Except as expressly provided herein, no provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of, interest and liquidated damages (if any) on, this Note at the time, place, and rate, and in the coin or currency, herein prescribed.  This Note is a direct debt obligation of the Company.  This Note ranks pari passu with all other Notes now or hereafter issued under the terms set forth herein.

c)     Lost or Mutilated Note. If this Note shall be mutilated, lost, stolen or destroyed, the Company shall execute and deliver, in exchange and substitution for and upon cancellation of

a mutilated Note, or in lieu of or in substitution for a lost, stolen or destroyed Note, a new Note for the principal amount of this Note so mutilated, lost, stolen or destroyed but only upon receipt of evidence of such loss, theft or destruction of such Note, and of the ownership hereof, and indemnity, if requested, all reasonably satisfactory to the Company.

   d) <u>Security Interest</u>.  This Note is a direct debt obligation of the Company and, pursuant to the Security Agreement is secured by a second priority perfected security interest in all of the assets of the Company for the benefit of the Holders.

   e) <u>Governing Law</u>. All questions concerning the construction, validity, enforcement and interpretation of this Note shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof. Each party agrees that all legal proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by any of the Transaction Documents (whether brought against a party hereto or its respective affiliates, directors, officers, shareholders, employees or agents) shall be commenced in the state and federal courts sitting in the City of New York, Borough of Manhattan (the "New York Courts"). Each party hereto hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, or such New York Courts are improper or inconvenient venue for such proceeding. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof.  Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Note or the transactions contemplated hereby. If either party shall commence an action or proceeding to enforce any provisions of this Note, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its attorneys fees and other costs and expenses incurred with the investigation, preparation and prosecution of such action or proceeding.

   f) <u>Waiver</u>.  Any waiver by the Company or the Holder of a breach of any provision of this Note shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Note. The failure of the Company or the Holder to insist upon strict adherence to any term of this Note on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Note.  Any waiver must be in writing.

   g) <u>Severability</u>.  If any provision of this Note is invalid, illegal or unenforceable, the balance of this Note shall remain in effect, and if any provision is inapplicable to any person or circumstance, it shall nevertheless remain applicable to all other persons and circumstances.  If it shall be found that any interest or other amount deemed interest due hereunder violates applicable laws governing usury, the applicable rate of interest due hereunder shall automatically be lowered to equal the maximum permitted rate of interest. The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law which

17

would prohibit or forgive the Company from paying all or any portion of the principal of or interest on this Note as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this indenture, and the Company (to the extent it may lawfully do so) hereby expressly waives all benefits or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impeded the execution of any power herein granted to the Holder, but will suffer and permit the execution of every such as though no such law has been enacted.

h)      <u>Next Business Day</u>.  Whenever any payment or other obligation hereunder shall be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

i)      <u>Headings</u>.  The headings contained herein are for convenience only, do not constitute a part of this Note and shall not be deemed to limit or affect any of the provisions hereof.

j)      <u>Seniority</u>.  This Note is senior in right of payment to any and all other indebtedness of the Company other than indebtedness owed to the Senior Lender.

**************************

18

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

**GLOBAL AXCESS CORP.**

Name:

Title: *CPO*

**ANNEX A**

**NOTICE OF CONVERSION**

The undersigned hereby elects to convert principal under the 9% Senior Subordinated Secured Convertible Note of Global Axcess Corp., a Nevada corporation (the "Company"), due on October 27, 2010, into shares of common stock, par value $0.001 (the "Common Stock"), of the Company according to the conditions hereof, as of the date written below. If shares are to be issued in the name of a person other than the undersigned, the undersigned will pay all transfer taxes payable with respect thereto and is delivering herewith such certificates and opinions as reasonably requested by the Company in accordance therewith. No fee will be charged to the holder for any conversion, except for such transfer taxes, if any.

By the delivery of this Notice of Conversion the undersigned represents and warrants to the Company that its ownership of the Common Stock does not exceed the amounts determined in accordance with Section 13(d) of the Exchange Act, specified under Section 4 of this Note.

The undersigned agrees to comply with the prospectus delivery requirements under the applicable securities laws in connection with any transfer of the aforesaid shares of Common Stock.

Conversion calculations:

Date to Effect Conversion:

Principal Amount of Notes to be Converted:

Payment of Interest in Common Stock __ yes __ no
        If yes, $_____ of Interest Accrued on Account of Conversion at Issue.

Number of shares of Common Stock to be issued:

Signature:

Name:

Address:

20

**Schedule 1**

**CONVERSION SCHEDULE**

The 9% Senior Subordinated Secured Convertible Notes due on October 27, 2010, in the aggregate principal amount of $3,500,000 issued by Global Axcess Corp., a Nevada corporation.  This Conversion Schedule reflects conversions made under Section 4 of the above referenced Note.

Dated:

| Date of Conversion (or for first entry, Original Issue Date) | Amount of Conversion | Aggregate Principal Amount Remaining Subsequent to Conversion (or original Principal Amount) | Company Attest |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |